UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THE ADMINISTRATORS OF THE                    CIVIL ACTION
TULANE EDUCATIONAL FUND
(A/K/A TULANE UNIVERSITY) and
DAVID H. COY, Ph.D.

VERSUS                                        NO: 08-5096

BIOMEASURE, INC., IPSEN,                      SECTION: R(1)
S.A., and IPSEN PHARMA,
S.A.S. (F/K/A SOCIETE
CONSIELS, DE RECHERCHE ET
D'APPLICATIONS SCIENTIFIQUES
SAS)

ORDER AND REASONS

     Before the Court are Ipsen S.A. ("Ipsen")'s and Ipsen

Pharma, S.A.S. ("Ipsen Pharma")'s motions to dismiss plaintiffs'

complaint under Federal Rule of Civil Procedure 12(B)(2).[1]  (R.

Docs. 18, 24, 38.)

**I.   BACKGROUND**

     This dispute involves the rights to a drug named

Taspoglutide, or BIM-51077.  Plaintiffs, Tulane University and

Dr. Coy, assert that BIM-51077 was developed as part of a joint

research program between Tulane, Dr. David Coy, and Biomeasure,

Inc. ("Biomeasure").  This research was conducted under the terms

of an Amended and Restated Research Funding Agreement ("RFA").

_____

     [1] As of January 1, 2008, Ipsen Pharma became the successor-
by-merger to Société Conseils, de Recherche et d'Applications
Scientifiques, S.A.S. ("SCRAS").  (_See_ R. Doc 38-3 at 2.)

The parties entered into the agreement in 1990, and the agreement was amended in 1997 and 1998.  Dr. Jacques-Pierre Moreau, the President and CEO of Biomeasure, negotiated and signed the 1997 and 1998 amendments on behalf of Biomeasure.  Ipsen, Ipsen Pharma and SCRAS were not parties to the RFA or its amendments.

Tulane and Biomeasure filed a joint patent application for certain compounds resulting from this research on December 7, 1998.  Tulane granted Biomeasure an exclusive license to compounds developed under the joint patent in 1999 (the "Licensing Agreement").  Ipsen, Ipsen Pharma and SCRAS were not parties to the Licensing Agreement.  On the same day that Tulane and Biomeasure filed the patent application, Biomeasure filed another "Biomeasure only" application that did not include Tulane or Dr. David Coy.  Plaintiffs allege that the Biomeasure only application covers compounds resulting from the Tulane/Biomeasure research program.  The Biomeasure only application resulted in United States Patent # 6,903,186 (the "'186 patent"), which was subsequently assigned to SCRAS and Ipsen Pharma and licensed to a Swedish pharmaceutical company for clinical testing and development.  Plaintiffs claim that the patenting and licensing of the '186 patent violates the parties' Research Funding Agreement and Licensing Agreement, and that Ipsen Pharma is not the rightful owner of the '186 patent.

Plaintiffs sued Ipsen, SCRAS and Biomeasure for unjust

enrichment, breach of contract and correction of inventorship.
Ipsen is a *société anonyme* organized under the laws of France.
(R. Doc. 18-5 at 1.)  Ipsen Pharma (f/k/a SCRAS) is a *société par
action simplifiée* organized under the laws of France.  (*Id.*)
Biomeasure is a corporation organized under the laws of
Massachusetts.  (R. Doc. 18-5 at 1.)  Ipsen owns all or nearly
all of Ipsen Pharma.  (R. Doc. 18-4 at 2; R. Doc. 38-2 at 2.)
Ipsen and Ipsen Pharma in turn jointly own 100 percent of
SUTREPA, S.A.R.L. ("SUTREPA"), a *société à responsabilité limitée
anonyme*.  (R. Doc. 18-4 at 2; R. Doc. 18-5 at 1.)  SUTREPA owns
100 percent of Biomeasure.  (R. Doc. 18-4 at 2.)

Ipsen and SCRAS were served with process pursuant to the
Hague Convention on Service Abroad of Judicial and Extrajudicial
Documents in Civil or Commercial Matters.  Ipsen and Ipsen Pharma
have moved to dismiss plaintiffs' claims against them for lack of
personal jurisdiction.  (*See* R. Docs. 18, 24, 38.)

On August 24, 2009, the Court determined that plaintiffs
failed to demonstrate personal jurisdiction over Ipsen, but
allowed plaintiffs to conduct limited jurisdictional discovery
and file a supplemental memorandum.  On October 6, 2009, the
Court similarly granted plaintiffs' request to file a
supplemental memorandum with respect to Ipsen Pharma.  Plaintiffs
filed supplemental memoranda on October 23, 2009.  The Court now
reevaluates whether plaintiffs have established personal

jurisdiction over Ipsen and Ipsen Pharma.

## II.  LEGAL STANDARD

When a nonresident defendant moves to dismiss for lack of
personal jurisdiction, the plaintiff bears the burden of showing
that personal jurisdiction exists.  *See Stuart v. Spademan*, 772
F.2d 1185, 1192 (5th Cir. 1985).  If the district court declines
to hold a full evidentiary hearing, the plaintiff need only make
a *prima facie* showing of jurisdiction.  *See Wilson v. Belin*, 20
F.3d 644, 648 (5th Cir. 1994).  The allegations in the complaint
must be taken as true unless controverted by affidavits, and all
factual conflicts must be resolved in favor of the plaintiff.
*See id.; Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165
(5th Cir. 1985).  In making its determination, the court may
consider "affidavits, interrogatories, depositions, oral
testimony, or any combination of the recognized methods of
discovery."  *Thompson*, 755 F.2d at 1165.

A court has personal jurisdiction over a nonresident
defendant if:  (1) the forum state's long-arm statute confers
personal jurisdiction over that defendant; and (2) the exercise
of jurisdiction complies with the Due Process Clause of the
Fourteenth Amendment.  *Latshaw v. Johnston*, 167 F.3d 208, 211
(5th Cir. 1999).  Because Louisiana's long-arm statute extends
jurisdiction to the full limits of due process, *see* La. Rev.
Stat. § 13:3201(B), a federal court sitting in Louisiana need

determine only whether the exercise of its jurisdiction satisfies the requirements of constitutional due process.

The exercise of personal jurisdiction over a nonresident defendant satisfies due process when: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state; and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Latshaw*, 167 F.3d at 211 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The defendant's connection with the forum state must be such that he "should reasonably anticipate being haled into court" there. *Latshaw*, 167 F.3d at 211 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Minimum contacts may give rise to either "specific" jurisdiction or "general" jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8-9 (1984). Specific jurisdiction exists when a plaintiff's cause of action arises from, or is related to, the nonresident defendant's minimum contacts in the forum state. *Id.* at 414 n.8; *Wilson*, 20 F.3d at 647. General jurisdiction exists if the defendant has engaged in "continuous and systematic" activities in the forum state. *Helicopteros*, 466 U.S. at 415; *Wilson*, 20 F.3d at 647.

**III. DISCUSSION**

Courts presume the institutional independence of related corporations, such as a parent and its subsidiary, when they determine if one corporation's contacts with a forum can be the basis of jurisdiction over a related corporation. *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999). It is established in the Fifth Circuit that when "a wholly owned subsidiary is operated as a distinct corporation, its contacts with the forum cannot be imputed to the parent." *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773-74 (5th Cir. 1988); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983) (finding that when parent and subsidiary maintain separate and distinct corporate entities, presence of one may not be attributed to the other). To fuse the two companies for jurisdictional purposes, there must be "proof of control by the parent over the internal business operations and affairs of the subsidiary." *Hargrave*, 710 F.2d at 1160.

The Fifth Circuit has identified at least seven factors relevant to the Court's jurisdictional analysis: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the two corporations have separate headquarters; (3) whether they have common officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems; (6) whether the parent exercises complete authority over general policy; and (7) whether the subsidiary

exercises complete authority over daily operations. *Dickson*, 179

F.3d at 339. It is not sufficient that one company owns 100

percent of the other and that they share the same officers and

directors. *Hargrave,* 710 F.2d at 1160. The degree of control

exercised by the parent must be greater than that typically

associated with common owners and directors. *Id.*

In *Hargrave*, the Fifth Circuit declined to attribute a

subsidiary's contacts with a forum to its parent because "the

corporate formalities were scrupulously observed," including

"separate bank accounts, accounting and payroll systems,

insurance contracts, budgets, and financial records." *Id*. at

1160. The parent and subsidiary "filed separate tax returns,"

and "[n]o assets of the corporations were commingled." *Id.* The

Fifth Circuit reached this result even though the parent "had

complete authority over [the subsidiary's] general policy

decisions . . ., including such matters as selection of product

lines, hiring and firing . . . officers, and approval of sizable

capital investments." *Id*. at 1160. The court found this level

of control "no more than that appropriate for a sole shareholder

of a corporation, and certainly not enough to warrant the

extraterritorial exercise of jurisdiction over that shareholder."

*Id*. at 1161.

A.   **IPSEN**

In determining whether Biomeasure's contacts with Louisiana

should be attributed to Ipsen, the Court considers the seven factors identified by the Fifth Circuit in *Dickson*.

It appears that Ipsen indirectly owns 100 percent of Biomeasure's stock. (*See* R. Doc. 18-4 ¶¶ 6-7.) This factor weighs in favor of attributing Biomeasure's contacts to Ipsen.

There is no evidence that Ipsen and Biomeasure share a corporate headquarters. It is uncontradicted that Biomeasure is a Massachusetts corporation located at 27 Maple Street in Milford, Massachusetts. (R. Doc. 18-1 at 3; R. Doc. 18-5 ¶ 2; R. Doc. 19-1 at 5.) It also is uncontradicted that Ipsen is a French société anonyme located at 65 quai Georges Gorse, Boulogne Billancourt, France. Although Ipsen's name appears on signage at Biomeasure's headquarters (*see* R. Doc. 19-1 at 5), this does not mean that they share corporate headquarters. A parent and subsidiary need not hide their business affiliation in order to maintain their legal independence. The second *Dickson* factor weighs against exercising jurisdiction over Ipsen.

It appears that Ipsen and Biomeasure share some officers and directors. In addition to serving as Biomeasure's President, Dr. Jacques-Pierre Moreau serves on the Ipsen Group's Executive Committee as Chief Scientific Officer. (R. Doc. 19-8 § 14.1.4; Almon Decl. Ex. J.) Dr. Albert Beaufour and Stéphane Francois appear to have been former Chairmen of both Biomeasure and Beaufour-Ipsen/Ipsen at times relevant to this dispute. (*See*

Pls.' Supp. Mem. in Opp. to Ipsen's Mot. to Dismiss at 7.)
Stéphane Thiroloix appears to provide guidance to Biomeasure's
Clinical Development, Project Management and Regulatory Affairs
units and serves on Ipsen's Executive Committee as Vice-President
for Corporate Development. (*See* R. Doc. 19-8 § 14.1.4.) Eric
Drapé appears to provide guidance to Biomeasure's recombinant
manufacturing and serves on Ipsen's Executive Committee as Vice-
President for Manufacturing. (*Id.*) Claire Giraut appears to
provide guidance to Biomeasure's Information Technology services
and also serves on Ipsen's Executive Committee as Chief Financial
Officer. The Court finds that these common affiliations
collectively favor attributing Biomeasure's contacts to Ipsen.
Alain Beguin's alleged affiliations to Biomeasure and Mayroy (a
holding company that allegedly controls Ipsen) is too tenuous to
have any bearing on the Court's jurisdictional analysis.

There is no evidence that Ipsen and Biomeasure fail to
observe corporate formalities. Nor is there any evidence that
Ipsen and Biomeasure share an accounting system. To the
contrary, the uncontradicted affidavit of Ipsen's Chief Executive
Officer, Jean Luc Belingard, states that "Biomeasure maintains
its own accounting system separate and apart from that of Ipsen
[and] has its own separate bank account(s)." (R. Doc. 18-4 ¶ 7.)
Plaintiffs allege that Ipsen Pharma supplies most or all of
Biomeasure's income, but Ipsen Pharma is not Ipsen.

Accordingly, the fourth and fifth *Dickson* factors weigh against exercising jurisdiction over Ipsen.

There is evidence that Ipsen exercises supervision over a number of Biomeasure's general policy decisions. First, Ipsen's Operations Committees appear to provide general guidance to the entire group of Ipsen affiliates. (*See* Pls.' Supp. Mem. Ex. F at 135.) Second, according to the "operating philosophy of the Ipsen Group," Biomeasure functions as only a "research subsidiary." (*See* Pls.' Supp. Mem. Ex. I at 73:19-25; 24:3-13.) Biomeasure thus does not commercially exploit the fruits of its research (*id.* at 73:10-18), and it appears to assign its intellectual property to Ipsen Pharma as a matter of course. (*See* Pls.' Supp. Mem. Ex. A at 75:1-25, 109:20-24; *id.* Ex. I at 23:16-24:13, 72:18-24.) Third, Ipsen sets guidelines for certain aspects of Biomeasure's budgeting and purchasing policies. (*See* Pls.' Supp. Mem. Ex. B.) A Purchasing, Signature, and Budget Management Policy for the Ipsen Group Companies ("PSBMP") "define[s] the financial and signatory authority as well as pre-approval requirements for all financial commitments, (including purchase commitments, contracts and agreements)." (*Id.* at BIM-0265.) Fourth, Biomeasure appears to perform certain activities "for or on behalf of" Ipsen.[2] (Pls.' Supp. Mem. Ex. D at BIM-

---

[2] The APA applies to Biomeasure's research, research supervision, clinical trial supervision, and marketing activities performed "for or on behalf of" Ipsen. (Pls.' Supp. Mem. Ex. D

0234.)  The Court presumes that Ipsen would exercise at least

general oversight over these activities.  Accordingly, the Court

finds that Ipsen's demonstrated ability to influence Biomeasure's

general policy decisions favors attributing Biomeasure's contacts

with Louisiana to Ipsen.

Although Ipsen appears to supervise a number of Biomeasure's

general policies, it does not control Biomeasure's daily

operations.  There is no evidence that Ipsen controls

Biomeasure's budget allocations or routine expenditures.

Plaintiffs assert that the PSBMP permits "certain budgeted costs

and/or specific activities" to be designated as "ringfenced," and

that ringfenced expenditures may not be committed without

approval of an Ipsen Executive Committee member.  (*Id.* at BIM-

0272.)  According to plaintiffs, "ringfenced" activities are

"day-to-day Biomeasure activities," but this allegation is

conclusory and unsupported by the record.  (*See* Pls.' Supp. Mem.

Ex. B at BIM-0271.)  Plaintiffs lastly rely on an International

Cash Pooling Agreement ("ICPA") between Biomeasure and SCRAS (*see*

Pls.' Supp. Mem. Ex. D at BIM-0224), but SCRAS is not Ipsen.

Accordingly, the Court finds that the seventh *Dickson* factor

weighs against attributing Biomeasure's contacts with Louisiana

---

at BIM-0234.)  The APA does not, however, suggest that all of
Biomeasure's research, research supervision, clinical trial
supervision, and marketing activities are performed for or on
behalf of Ipsen.

to Ipsen.

After considering these factors, the Court finds that it lacks personal jurisdiction over Ipsen. Only three factors favor exercising jurisdiction: ownership; common directors; and general policy decisions. The Fifth Circuit has been clear that "100% stock ownership and commonality of officers and directors are not alone sufficient." *Hargrave,* 710 F.2d at 1160. Ipsen's control over Biomeasure's general policy decisions is insufficient to change this calculus. Ipsen's control is "no more than that appropriate for a sole shareholder of a corporation, and certainly not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder." *Hargrave*, 710 F.2d at 1161. There is nothing improper about a corporate parent setting general budgeting and purchasing guidelines for its wholly-owned subsidiary or limiting the scope of the subsidiary's strategic activities. *See Hargrave*, 710 F.2d at 1160 (finding no personal jurisdiction even though parent selected product lines, hired and fired subsidiary's officers, and approved sizable capital investments); *Bauman v. DaimlerChrysler Corp.*, 579 F.3d 1088, 1095 (9th Cir. 2009) ("[A]ppropriate parental involvement includes: monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."). There is no evidence that Ipsen

controls Biomeasure's day-to-day operations, and both entities maintain necessary corporate formalities. Accordingly, Biomeasure's contacts with Louisiana may not be attributed to Ipsen.

###   2.   IPSEN PHARMA

In determining whether Biomeasure's contacts with Louisiana should be attributed to Ipsen Pharma, the Court again considers the seven factors identified by the Fifth Circuit in *Dickson*.

It appears that Ipsen Pharma indirectly owns Biomeasure's stock with Ipsen. (*See* R. Doc. 18-4 at 2; R. Doc. 18-5 at 1.) This factor favors attributing Biomeasure's contacts to Ipsen Pharma.

There is no evidence that Ipsen Pharma and Biomeasure share a corporate headquarters. It is undisputed that Ipsen Pharma is a French société par actions simplifée located at 65 quai Georges Gorse, Boulogne Billancourt, France. (*See* R. Doc. 38-3.) This factor weighs against exercising jurisdiction over Ipsen Pharma.

It appears that Biomeasure and Ipsen Pharma share some officers and directors. Dr. Jacques-Pierre Moreau is Biomeasure's President and was a Managing Director of SCRAS before its merger with Ipsen Pharma. (*See* R. Doc. 38-3 at 4.) Claire Giraut is a managing director of Ipsen Pharma and appears to have responsibility for Biomeasure's Information Technology services. Stéphane Thiroloix is a managing director of Ipsen

Pharma and appears to run Biomeasure's Clinical Development,
Project Management and Regulatory Affairs units.  This factor
favors exercising jurisdiction over Ipsen Pharma.

There is no evidence that Ipsen Pharma and Biomeasure have
not observed corporate formalities.  Nor is there any evidence
that Ipsen and Biomeasure share an accounting system.  Plaintiffs
assert that Ipsen Pharma supplies most or all of Biomeasure's
income on a cost-plus-markup basis pursuant the terms of a
unilateral Advance Pricing Agreement ("APA") between Biomeasure
and the United States Internal Revenue Service ('IRS").[3]  (*Id.* at
73:10-18.)  The APA does not support plaintiffs' position.  The
APA "addresses the arm's-length nature of prices charged or
received in the aggregate" between Biomeasure and Ipsen Pharma.
The IRS thus appears to have acknowledged for tax purposes that
the cost-plus-markup payments from Ipsen Pharma to Biomeasure for
its research services are commercially reasonable.  (Pls.' Supp.
Mem. Ex. D at BIM-0234.)  Plaintiffs do not allege that
Biomeasure is undercapitalized or that it receives inadequate

--------

[3] A unilateral APA is a binding arrangement made between a
company and a tax authority about what method the company will
use to calculate transfer prices.  *Blacks Law Dictionary*,
"Advance Pricing Agreement" (9th ed. 2004).  A "transfer price"
is the price charged by "one segment of an organization for a
product or service supplied to another segment of the same
organization."  *Blacks Law Dictionary*, "Price - Transfer Price"
(9th ed. 2004).  The purpose of the agreement is to reduce or
eliminate double taxation.  *Blacks Law Dictionary*, "Advance
Pricing Agreement" (9th ed. 2004).

income from Ipsen Pharma, and the Court sees no reason to find otherwise. Plaintiffs also point out that Biomeasure participates in the ICPA. But receiving commercially reasonable investment financing from Ipsen Pharma is different from sharing an accounting system or commingling accounts. Plaintiffs do not allege that Biomeasure's funds are unaccounted for once they are received from or deposited with Ipsen Pharma under the ICPA. Indeed, it appears that "funds deposited or financed to/from S.C.R.A.S. pay or charge interest on the basis of the London Interbank Offered Rate (LIBOR)." (Pls.' Supp. Mem. Ex. D. at BIM-0224.) The Fifth Circuit has held that "[t]he existence of intercorporate loans does not establish the requisite dominance, and in fact, interest-bearing loans suggest separation of corporate entities." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) (internal citations omitted). Accordingly, this factor does not favor exercising jurisdiction over Ipsen Pharma.

Although Biomeasure appears to assign its intellectual property to Ipsen Pharma as a matter of course (*see* Pls.' Supp. Mem. Ex. A at 75:1-25, 109:20-24; *id.* Ex. I at 23:16-24:13, 72:18-24), there is no evidence that Ipsen Pharma has authority over Biomeasure's general policies or daily operations. Although Ipsen Pharma provides income and financing to Biomeasure, it appears that these funds are provided on a commercially

reasonable basis, and there is no indication that they are used to exert control over Biomeasure.  Accordingly, this factor weighs against exercising jurisdiction over Ipsen Pharma.

After considering these factors, the Court finds that it lacks personal jurisdiction over Ipsen Pharma.  Only two factors favor exercising jurisdiction:  ownership and common directors. This is insufficient.  *See Hargrave,* 710 F.2d at 1160 ("100% stock ownership and commonality of officers and directors are not alone sufficient.").  Accordingly, Biomeasure's contacts with Louisiana may not be attributed to Ipsen Pharma.

Plaintiffs lastly argue that the Court may exercise general personal jurisdiction over Ipsen and Ipsen Pharma.  (*See* Pls.' Supp. Mem. in Opp. to Ipsen's Mot. to Dismiss at 19.)  To establish general personal jurisdiction, plaintiffs must demonstrate that Ipsen's or Ipsen Pharma's contacts with Louisiana are "continuous and systematic."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). The Supreme Court discussed "continuous and systematic" contacts in *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952).  In *Perkins*, the president, principal stockholder and manager of a foreign company moved to Ohio and maintained an office in which he kept files, carried on correspondence, drew and distributed salary checks, maintained two active bank accounts and supervised foreign properties on behalf of the company.  *Id.* at 447-48.  In

short, he "discharged his duties as president and general manager" from Ohio. *Id.* Nothing close to the facts in *Perkins* has been established in this case. The Court has already determined that Biomeasure is separate from Ipsen and Ipsen Pharma, and that Biomeasure's contacts with Louisiana may not be attributed to them. There is no evidence that Ipsen or Ipsen Pharma maintain an office in Louisiana, carry on correspondence in Louisiana, maintain bank accounts in Louisiana, or supervise their operations from Louisiana. That Ipsen Pharma entered into a single, unrelated assignment agreement with Tulane concerning somatostatin patents is insufficient to create continuous and systematic contacts. *See Helicopteros*, 466 U.S. at 416. Accordingly, the Court finds that it lacks general personal jurisdiction over Ipsen and Ipsen Pharma.

Plaintiffs point out that Ipsen's subsidiary, Tercica, Inc., is currently sponsoring a clinical trial at Louisiana State University. But plaintiffs cannot attribute the actions of Tercica to Ipsen without satisfying the *Dickson* factors set forth above. Plaintiffs have not even attempted to demonstrate that Ipsen exercises sufficient control over Tercica to fuse the two for jurisdictional purposes, and the Court rejects this basis for exercising jurisdiction over Ipsen. *See Hargrave*, 710 F.2d at 1160.

Plaintiffs also argue that Biomeasure is Ipsen's "general

17

agent" in the United States.  A "general agent" has been defined
as "one who performs duties which are sufficiently necessary to
the corporation's operations.  The services performed by the
agent must be so important to the corporate principal that if it
did not have the stand-in to perform them, the corporation's own
people would do it themselves."  *Nolan v. Boeing Co.*, 736 F.
Supp. 120, 125 (E.D. La. 1990); *see also Wells Fargo & Co. v.
Wells Fargo Exp. Co.*, 556 F.2d 406, 422 (9th Cir. 1977).  The
Court finds that plaintiffs have failed to meet this standard.
Plaintiffs' conclusory assertions notwithstanding, there is no
evidence in the record that Biomeasure's research activities in
the Untied States are "necessary" to Ipsen's operations or that
Ipsen would have to perform them if Biomeasure did not.

     **3.  Agency**

    Although plaintiffs have not prevailed under the *Dickson*
factors, they assert that the Court may nonetheless exercise
jurisdiction over Ipsen and Ipsen Pharma because Biomeasure acts
on their behalf, or as their agent.  The Court rejects this
argument for the same reasons stated above:  plaintiffs have
failed to demonstrate that Ipsen and Ipsen Pharma exercise
sufficient control over Biomeasure.  *See Dickson*, 179 F.3d at 338
(holding that plaintiff's agency "argument fails because it
cannot demonstrate that [parent] exercised control over
[subsidiary]").  It is entirely appropriate for a wholly-owned

subsidiary to act for the benefit of its sole shareholder.  *See Hargrave*, 710 F.2d at 1161; *Dickson*, 179 F.3d at 338 (subsidiary acting as "middleman" for parent's benefit "not enough" to establish prima facie case of control); *id.* at 340 ("Although there is amble evidence of the [family] corporations having many dealings with each another, there is no evidence in the record of [the parent] exercising any control over [the subsidiary].").  Indeed, it would be surprising if a wholly-owned subsidiary did not act for its parent's benefit.  In order to establish jurisdiction over Ipsen or Ipsen Pharma as a result of Biomeasure's contacts with Louisiana, which is what plaintiffs are attempting to do, plaintiffs must demonstrate "something beyond the subsidiary's mere presence within the bosom of the corporate family."  *Dickson*, 179 F.3d at 338.  Specifically, plaintiffs must prevail under the factors set forth in *Dickson*.  *See* 179 F.3d at 339; *see also Bauman*, 579 F.3d at 1095 (holding that to establish that subsidiary is agent of parent for jurisdictional purposes, "the parent must exert control that is so pervasive and continual that the subsidiary may be considered an agent or instrumentality of the parent, notwithstanding the maintenance of corporate formalities").  Plaintiffs have failed to do so, and accordingly the Court lacks jurisdiction over Ipsen and Ipsen Pharma.

Separately, plaintiffs' agency theory fails because they

have failed to demonstrate that Biomeasure exercised express or
apparent authority on behalf of Ipsen and Ipsen Pharma. *See
Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492-93 (5th
Cir. 1974), *overruled on other grounds, Ins. Corp. of Ireland v.
Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-03 (1982);
*see also Nolan v. Boeing Co.*, 736 F. Supp. 120, 126 (E.D. La.
1990). In Louisiana, "an agency relationship is created by
either the express appointment of a mandatory under Civil Code
Article 2985, or by some implied appointment which traces to
apparent authority." *Nolan*, 736 F. Supp. at 126. Plaintiffs do
not claim (and have not presented any evidence) that SCRAS, Ipsen
Pharma or Ipsen expressly appointed Biomeasure to negotiate or
enter into the RFA and Licensing Agreement with plaintiffs.
Instead, plaintiffs assert that Biomeasure acted as an implied
agent for Ipsen and Ipsen Pharma. (*See* Supp. Mem. in Opp. to
Ipsen's Mot. to Dismiss at 16; Supp. Mem. in Opp. to Ipsen
Pharma's Mot. to Dismiss at 7.)

To establish implied agency, plaintiffs must demonstrate
that (1) Ipsen or Ipsen Pharma, as principal, made some overture
or inference to plaintiffs; and (2) plaintiffs reasonably relied
on Biomeasure's purported authority as a direct consequence of
these representations. *Id.* Plaintiffs have failed to satisfy
both steps of this inquiry. There is no evidence that SCRAS,
Ipsen Pharam or Ipsen made any overture or inference to

plaintiffs at the time the RFA and Licensing Agreement were negotiated and executed. The RFA between Biomeasure and Tulane refers to Dr. Jacques-Pierre Moreau's role as President of Biomeasure, not as an officer of SCRAS, Ipsen Pharma or Ipsen. (*See* R. Doc. 19-15, Ex. F.) The 1997 and 1998 addenda to the RFA similarly refer to Dr. Moreau's affiliation with Biomeasure and not Ipsen or Ipsen Pharma. (*See* R. Doc. 19-15, Ex. E.)

Dr. Moreau's letter to Tulane dated September 15, 2008 also refers to his role as President and CEO of Biomeasure. (R. Doc. 19-15, Ex. G.) Although the letter was drafted on Ipsen letterhead, this fact does not implicate SCRAS or Ipsen Pharma. Furthermore, the letter was drafted well after the '186 patents were obtained and could not have formed a reasonable basis for plaintiffs' purported belief that Biomeasure was acting on behalf of Ipsen with respect to the RFA and Licensing Agreement.

Plaintiffs point out that Ipsen Pharma executed an assignment agreement with Tulane concerning unrelated somatostatin patents. (*See* R. Doc. 38-3 at 5.) Ipsen Pharma's direct participation in the somatostatin agreement highlights the fact that SCRAS, Ipsen and Ipsen Pharma were *not* involved in the agreements at issue in this case. Plaintiffs are sophisticated parties that knew how to contract with Biomeasure's parent corporations. They did not do so with respect to the RFA and Licensing Agreement. Indeed, the parties amended the RFA in 1997

and 1998 and twice declined to add SCRAS, Ipsen Pharma or Ipsen to the agreement. All of this suggests that plaintiffs did not reasonably attribute Biomeasure's actions with respect to the RFA and Licensing Agreement to SCRAS, Ipsen Pharma or Ipsen.

Lastly, plaintiffs have submitted a Second Declaration of David H. Coy. (Supp. Mem. in Opp., Second Declaration of David H. Coy.) Dr. Coy declares that he met with employees of Ipsen "on more than one occasion" in Europe "[d]uring the course" of the GLP-1 joint research program from approximately 1990 to 2005. (*Id.* ¶ 3-4.) He also declares that he understood that Biomeasure did not possess the capacity or financial resources to develop or market pharmaceutical products resulting from the research program, and that these resources would be provided by Ipsen. (*Id.* ¶ 5.) The declaration does not help plaintiffs. Dr. Coy does not state that SCRAS, Ipsen Pharma or Ipsen represented that Biomeasure was acting on their behalf in executing the RFA and Licensing Agreement. Nor does Dr. Coy state that plaintiffs relied on any specific representation by SCRAS, Ipsen Pharma or Ipsen in executing or exploiting the agreements. Dr. Coy does not even state that he met with Ipsen employees *about* the GLP-1 joint research program. That Dr. Coy may have met with Ipsen employees more than once over a twenty year period about unidentified topics does not make Biomeasure an agent of Ipsen or Ipsen Pharma with respect to the RFA and Licensing Agreement.

22

Dr. Coy's subjective belief about Biomeasure's financial ability to perform research, without an additional statement that SCRAS or Ipsen Pharma fostered that belief, is irrelevant. Accordingly, Biomeasure's contacts with Louisiana may not be attributed to Ipsen Pharma or Ipsen under an agency theory.

**4.   Successor-in-interest**

Plaintiffs argue that Ipsen Pharma is subject to the Court's jurisdiction because it is the "assignee" or "successor-in-interest" to the '186 patent at issue in this case. (Pls.' Supp. Mem. in Opp. to Ipsen Pharma's Mot. to Dismiss at 9.) The Court rejects this argument.

In *Patin v. Thoroughbred Power Boats Inc.*, the Fifth Circuit explained that "a successor corporation that is deemed to be a 'mere continuation' of its predecessor corporation can be bound by the predecessor corporation's voluntary submission to the personal jurisdiction of a court." 294 F.3d 640, 654 (5th Cir. 2002). *Patin* was based on the reasoning that "because the two corporations . . . are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis." *Id.* at 653 (emphasis in original). The Court has already determined that Biomeasure and Ipsen Pharma are not the "same entity" for jurisdictional purposes. Accordingly, Ipsen Pharma is not a "mere continuation" of Biomeasure, and it is not subject

to this Court's jurisdiction as a successor-in-interest to Biomeasure.

In acquiring the '186 patent, Ipsen Pharma may have submitted to the jurisdiction of the District Court for the District of Columbia, *see* 35 U.S.C. § 293, but it did not submit to jurisdiction in Louisiana simply because the patent may have arisen out of research in Louisiana. *See Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (holding that foreseeability of causing injury in forum state is not sufficient for specific personal jurisdiction); *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003) (observing that patent "assignee does not step automatically into the shoes of the assignor for purposes of personal jurisdiction"); *id.* ("[T]he distinction between a corporate successor and an assignee of a contract is a sound one."). There is no evidence that Ipsen Pharma solicited or negotiated any of the contractual obligations at issue in this case. Instead, the evidence indicates that Ipsen Pharma is the assignee of a patent obtained by a distinct corporate subsidiary. The Court finds that this is insufficient to establish minimum contacts with Louisiana in this case.

## IV. CONCLUSION

For the reasons stated, the Court lacks personal jurisdiction over Ipsen and Ipsen Pharma, and plaintiffs' claims

against them are DISMISSED WITHOUT PREJUDICE.


New Orleans, Louisiana, this 10th day of November, 2009.


_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE